# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Sergey F., | Case No. 18-cv-1276-KMM |
| Plaintiff, | |
| v. | **ORDER** |
| Andrew Saul, Commissioner of Social Security | |
| Defendant. | |

This matter is before the Court on the parties' cross-motions for summary judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 11; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 19.) For the reasons set forth below, Sergey F.'s (hereafter "Mr. F") motion for summary judgment is GRANTED and the Commissioner's motion for summary judgment is DENIED.

## I.  Factual Background and ALJ Decision[1]

Mr. F was born in Russia and had a very difficult childhood, which included severe abuse, exposure to violence within his family, and other trauma. (R. 402.) He has received a number of mental health diagnoses over the years, including: posttraumatic stress disorder; attention deficit hyperactivity disorder; depression; anxiety; antisocial personality disorder; and bipolar disorder. Over a fifteen-year period, he was fired from every job he held based on his inability to control his behaviors. (R. 344–45, 351, 402.) Mr. F's issues with anger and erratic behavior have also significantly strained his personal and family relationships. (R. 345, 352, 402.)

---

[1]  This factual summary focuses on those aspects of the record relevant to the question of whether the Administrative Law Judge gave appropriate weight to opinion evidence in this case.

1

Mr. F first filed for disability insurance benefits on February 5, 2015 and Supplemental Security Income on March 13, 2015, alleging disability beginning on January 1, 2013. (R. 218, 222.) His claims were denied initially and upon reconsideration. (R. 120, 135.) He timely requested a hearing before Administrative Law Judge Micah Pharris, which was held on June 13, 2017. (R. 33.) On July 20, 2017, ALJ Pharris issued an unfavorable decision. Mr. F timely filed a request for review to the Appeals Council, which was denied on March 30, 2018. Thus, the ALJ's decision became the final determination of the Commissioner, making Mr. F's case ripe for review by this Court.

### A. Opinions of Treating Providers

After a psychiatric hospitalization in February 2013, (R. 341, 346), Mr. F began psychiatric treatment with Jennifer Wolfe, RN, CNS, Psychiatric Advanced Practice Nurse. (R. 402.) Mr. F continues treatment with Nurse Wolfe to this day, and her care of him includes prescribing and managing psychiatric medication. (*Id.*) During her first exam, she described Mr. F as agitated, easily angered and impulsive, with a limited and short attention span, a depressed mood, short-term memory problems, and intense speech. (*Id.*) Nurse Wolfe diagnosed Mr. F with impulse control and bipolar disorders in addition to anger management issues. (R. at 403.) She later added diagnoses of intermittent explosive disorder, post-traumatic stress disorder (PTSD), and attention deficit hyperactivity disorder (ADHD). (R. 376, 397.)

On December 17, 2015, Nurse Wolfe noted that Mr. F "may be at baseline in terms of what medications can do for him." (R. 433.) Despite being on several medications to treat his mental-health conditions, Mr. F experienced ongoing and severe challenges managing his mood, anger, focus, and anxiety. (R. 432–33.) Nurse Wolfe noted that Mr. F "[a]voids leaving the house due to anxiety around other people," and is "[a]bsolutely incapable of holding a job." (R. 432.) Even while on his medications, Mr. F appeared dysthymic and anxious, with scattered memory and limited attention due to his ADHD. (R. 433.) He was hypervigilant and had abnormal thoughts that were "bordering of psychotically paranoid." (*Id.*) His PHQ-9 score, which measures the severity of an individual's depression symptoms, was 20.

(*Id.*)  Nurse Wolfe "strongly encouraged" Mr. F to return to psychotherapy, which he did in April 2016.  (R. 434, 462.)

Mr. F's condition worsened over time.  On March 22, 2016, Nurse Wolfe saw Mr. F and noted a "flat and irritable" mood, with high anxiety, ongoing problems managing his anger, and trouble with focus.  (R. 441.)  Mr. F had severe difficulty sleeping, reporting that he hadn't slept for "several days."  (*Id.*)  His other complaints included an "inability to be a 'normal person' and to be around other people, shakiness towards the evening, 'poor memory,' [and] zoning out and ending up at the wrong store."  (*Id.*)  Nurse Wolfe noted that Mr. F presented as "highly anxious, slightly agitated, [and] tensely wound."  (*Id.*)  Notably, Mr. F experienced these challenges despite medication compliance.  (*Id.*)  At another appointment a few weeks later, on April 12, 2016, Mr. F presented once again as "highly anxious, dysphoric, [and] blunted."  (R. 444.)  This pattern continued, and Mr. F showed little to no change or improvement in his symptoms over the following nine months.  (R. 447–461.)

In addition to taking his medication and attending regular appointments with Nurse Wolfe, Mr. F began seeing David Schmitt, MSW, LICSW, for psychotherapy.  (R. 462.)  At his first appointment in April 2016, Mr. F's PHQ-9 score was 20, and his GAD-7 score was 17.  (*Id.*)  He was experiencing severe impairment due to depressed mood and moderate impairment due to social withdrawal.  (R. 464–65.)  Additionally, Mr. F consistently reported social and interpersonal challenges including an inability to engage socially and "apparent social phobia."  (*See, e.g.*, R. 498.)  Mr. Schmitt's records include several examples of Mr. F's inability to handle social situations.  In May 2016, he had to leave a Twins baseball game after getting in a fight with his wife.  (R. 472.)  Around the same time, he had to hide from his son's birthday party.  (R. 496.)  On September 28, 2016, Mr. F reported that he had gone to the zoo, but "couldn't handle it."  (R. 499.)  He stated that after somebody stepped on his toe, he had to leave.  (*Id.*)  That same day, Mr. Schmitt notes that Mr. F. was "extremely anxious and unable to find relief on a daily basis."  (*Id.*)

Mr. F continued to experience severe mental health symptoms.  On December 19, 2016, Mr. F missed his appointment with Mr. Schmitt because of an earlier panic attack.  He explained that he had an earlier appointment with Nurse Wolfe, but then

3

got lost attempting to find his car after the appointment, which caused the attack. (R. 513.) Nurse Wolfe noted on February 20, 2017 that Mr. F was experiencing full-blown panic attacks every few weeks when in public, and that his irritability and depressed mood were "very high." (R. 531.) On May 23, 2017, Mr. F reported to Nurse Wolfe that he was still having full panic attacks and experiencing depression and irritability. (R. 534.) Nurse Wolfe noted that Mr. F smashed a model boat that he was making. (*Id.*) These severe mental-health symptoms continue throughout the time period covered by the record.

Nurse Wolfe provided a three-page medical source statement on February 14, 2017. She noted a poor prognosis, explaining that Mr. F was receiving high doses of multiple psychiatric medications with only limited success. (R. 425.) She rated Mr. F's ability to perform a number of work-related mental activities as "poor," with no useful ability to function, including, *inter alia*, the ability to maintain attention and concentration for extended periods, work with or near others without being distracted by them, interact appropriately with the public, accept instructions and respond appropriately to criticism from supervisors, and complete a normal workday or workweek. (R. 425–426.) She supported these conclusions with observations from her treatment of Mr. F. (*Id.*) She opined that he would be off task for more than 25% of a typical workday, and that Mr. F's impairments would cause him to absent from work more than four days per month.

On April 20, 2017, Mr. Schmitt completed a medical source statement. He also reported a poor prognosis, stating there had been "no change in years." (R. 525.) Mr. Schmitt opined that Mr. F had no useful ability to function in a number of persistence and pace activities or work-related activities involving interacting with others. (R. 525–26.) Like Nurse Wolfe, he determined that Mr. F would be off task at least 25% of a typical workday and would be absent from work more than four days per month. (R. 526–27.) Dr. Andrew D. Krueger, a psychological evaluations specialist who collaborated with Nurse Wolfe and Mr. Schmitt, completed a psychological evaluation of Mr. F and performed an extensive record review. (R. 404, 522–23.) He concurred with Nurse Wolfe and Mr. Schmitt's opinions in his own medical source statement. (R. 522.) Dr. Krueger determined that Mr. F has no useful ability to function in multiple "persistence and pace" and "interacting with others"

4

categories. (R. 522–23.) He opined that "[t]he clinical data support severe cognitive, behavioral, and psychological functioning [limitations] daily." (R. 523.)

### B. Consultative Examination and Opinions

Dr. Donald Wiger, PhD, LP, performed a psychological evaluation for the Social Security Administration on April 30, 2015. During the exam, Mr. F reported that he "does not get along with other people" and "cannot take orders from other people and does not like being told what to do." (R. 413.) He described the difficulties these anger problems had caused, including fights, being fired from jobs, difficulty socializing with coworkers and neighbors, legal problems, and domestic issues. (R. 413–14.) Based on this exam and a review of Mr. F's medical records, Dr. Wiger diagnosed him with antisocial personality disorder with significant anger issues. (R. 415.) Specifically, he concluded that:

> He is able to understand and follow directions…sustain attention and concentration… [and] carry out work-like tasks with reasonable persistence and pace. He gets along very poorly with other people. He likely is able to handle the stressors of at least an entry-level workplace if he is working alone. He would have difficulties working with coworkers and has significant concerns in dealing with authority figures.

(R. 415–16.)

Two additional consultants reviewed Mr. F's medical records in 2015, though neither met or examined him. Each found that Mr. F had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 62, 75.)

### C. Mr. F.'s Testimony

Mr. F testified at the June 13, 2017 hearing before ALJ Pharris. He explained that he cannot handle when people talk about him or criticize him. (R. 43.) "I blow up." (*Id.*) He told the ALJ that others have called the police on him because of his behavior when he is criticized. (*Id.*) He described himself as always angry, and that he doesn't "know how to live between people." (R. 44.) Mr. F testified that he often

5

does not leave the house because it gives him too much anxiety to do so. (*Id.*) He also described severe anxiety, regular panic attacks, an inability to sleep, and nightmares when he does sleep. (R. 45–47.) Mr. F told the ALJ that he struggles with concentration and cannot maintain his focus, even while watching television. (R. 46.)

### D. ALJ Pharris's Decision

ALJ Pharris followed the five-step sequential evaluation process for determining whether Mr. F is disabled. At Step One, ALJ Pharris determined that Mr. F had not engaged in substantial gainful activity since his claimed date of disability. (R. 12.) At Step Two, ALJ Pharris determined that Mr. F had several severe impairments: bipolar disorder, antisocial personality disorder, depression, unspecified neurocognitive disorder, post-traumatic stress disorder (PTSD), and attention deficit hyperactivity disorder (ADHD).

At Step Three, ALJ Pharris determined that none of Mr. F's impairments, separately or in combination, met or equaled the severity of any listed impairments. Specifically, he considered listings 12.02, 12.04, 12.06, 12.08, 12.11, and 12.15. (R. 14.) In making this determination, he considered the functional assessments set out in 20 C.F.R. Part 404, Subpart P, Appendix 1, often referred to as the "paragraph B" criteria. These criteria evaluate four areas of functioning: "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." *Id.* To satisfy the paragraph B criteria, a claimant's mental illness must cause an "extreme" limitation in one area of functioning or a "marked" limitation in two areas of functioning. *Id.* An extreme limitation is characterized by an individual's inability to function in the respective area independently, appropriately, and effectively on a sustained basis. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(F)(2)(e). A marked limitation means that the claimant's ability to independently, appropriately, and effectively function in a particular area on a sustained basis is seriously limited. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(F)(2)(d).

ALJ Pharris found that Mr. F is moderately limited in all four functional areas considered under the Paragraph B criteria. (R. 15–17.) As a result, he concluded that Mr. F does not meet or medically equal any of the listed impairments. (R. 17.)

At Step Four, ALJ Pharris determined that Mr. F has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with several nonexertional limitations: "limited to simple, routine tasks; may have occasional superficial contact with supervisors; no contact with coworkers and the public." (R. 17–18.) ALJ Pharris explained that limiting Mr. F to superficial contact with others means he is limited to jobs "rated no lower than an 8 on the selected characteristics of occupations (SCO) people rating" and that the work he is able to do "cannot require coworker interaction for its completion." (R. 18.) He then determined that Mr. F can perform his past relevant work as a warehouse worker. As a result, the ALJ found that Mr. F is not disabled under the Act.

In determining Mr. F's RFC described above, the ALJ considered the opinions of various treating and non-treating sources. He assigned some weight to Global Assessment of Functioning ("GAF") scores reflected in Mr. F's medical records. (R 21–22.) ALJ Pharris gave "some weight" to the opinion of psychological consultative examiner Dr. Wiger, who found Mr. F could: understand and follow directions; sustain attention and concentration; carry out work-like tasks with reasonable persistence and pace; and handle the stressors of at least an entry-level workplace if he is working alone. (R. 22.) He did not give "much weight" to Mr. F's treating providers Nurse Wolfe, Mr. Schmitt, and Dr. Krueger. (R. 22–24.) As for the state agency consultants who reviewed Mr. F's medical records, but did not meet with him, ALJ Pharris assigned their opinions "some weight." (R. 24–25.)

## II.   Analysis

Mr. F challenges the ALJ's determination on three separate grounds. First, he argues that ALJ Phariss erred in determining that his severe impairments did not meet or equal the listings, with a focus on the paragraph B criteria. Second, Mr. F argues that the ALJ failed to comply with SSR 96-8p when assessing Mr. F's RFC, committing reversible error. Finally, he argues that the ALJ failed to give proper weight to Mr. F's treating providers' medical opinions regarding his ability to work. After careful review, the Court concludes that the ALJ impermissibly dismissed Mr. F's treating providers' medical opinions, and remands on that basis.

### A. Standard

In reviewing the Commissioner's denial of Mr. F's application for benefits the Court determines whether the decision is supported by "substantial evidence on the record as a whole" and whether it results from an error of law. *Gann v. Berryhill*, 864 F.3d 947, 950 (8th Cir. 2017); *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); *see also* 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance of the evidence, but is such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion." *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014) (internal citations and quotation marks omitted). The court considers not only the evidence supporting the Commissioner's decision, but also the evidence in the record that "fairly detracts from that decision." *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005). However, a court does not reverse the Commissioner's decision merely because substantial evidence also supports a contrary outcome or because the record might support a different conclusion. *Gann*, 864 F.3d at 950; *Reed*, 399 F.3d at 920. A court should reverse the Commissioner's decision only where it falls outside "the available zone of choice," meaning that the Commissioner's conclusion is not among the reasonable positions that can be drawn from the evidence in the record. *See Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008).

### B. Weight Given to Treating Provider's Opinions

Mr. F argues that the ALJ improperly rejected Nurse Wolfe and Mr. Schmitt's opinions. Specifically, he asserts that the ALJ erred when he gave the greatest weight to Dr. Wiger's consultative opinion, and little to no weight to the opinions of treating providers Nurse Wolfe and Mr. Schmitt. The Court agrees in part. The ALJ improperly discounted Nurse Wolfe's opinion, which was supported by acceptable medical diagnostic techniques and was consistent, both internally and with the complete record. The ALJ stated that he did "not give this opinion much weight." (R. 22.) So steeply discounting Nurse Wolfe's opinion and elevating the consulting physician opinions was not a decision that is supported by substantial evidence on the record as a whole, and was therefore in error. The Court does not endeavor to articulate the weight that should be given to Nurse Wolfe's opinion on remand, but finds that the reasons provided for affording her evaluation scant weight are not

supported by substantial evidence and must be reevaluated consistent with the following discussion.

A treating medical provider has the "best opportunity to observe and evaluate a claimant's condition. *Morse v. Shalala*, 16 F.3d 865, 872 (8th Cir. 1994). Indeed, "the report of a consulting physician who examined the claimant once, or one who has not examined the claimant at all, does not constitute 'substantial evidence' upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician." *Hancock v. Secretary of the Dep't of Health, Educ. and Welfare*, 603 F.2d 739, 740 (8th Cir. 1979).

The ALJ rejected Nurse Wolfe's opinion for three reasons: (1) the "check block" format of the opinion; (2) her treating notes were "just periodic treatment and medication adjustments"; and (3) the opinion is inconsistent with the record. (R. 22–23.) The Court finds that none of these rationales find adequate support in the record, and none support the ALJ's decision to give her opinion so little weight.

First, the Court finds that it was inappropriate for the ALJ to reject Nurse Wolfe's opinion simply because of the format. The opinion was contained on a three-page form that had places where only check marks were required as well as lined spaces that allowed for written notes and observations. While relatively brief, the form is neither conclusory nor unexplained. Rather, it explains Nurse Wolfe's ongoing treatment of Mr. F, his diagnoses and symptoms, the treatments attempted, and the success (or lack thereof) of those treatments. (R. 425.) Nurse Wolfe also provides short explanations for her findings related to the checkboxes on the form, which rate her opinion of Mr. F's ability to perform work-related mental activities. For example, she gave Mr. F a "poor" rating for his ability to: interact appropriately with the public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers and peers; maintain socially appropriate behavior; and respond appropriately to changes in the work setting. (R. 426.) She supported these findings by noting "He loses his temper around people, has alienated all the people around him except his wife, who is often in tears about how difficult he is to get along with. Paranoid. Avoids all people & public places." (*Id.*) Further, she notes that Mr. F was not fully responsive to treatment, explaining that he had been prescribed "high doses of multiple

9

med[ications], with only limited success – we have tried everything I can think of. Mania is managed, but not depression." (*Id.* at 425.)

Furthermore, the ALJ should have considered the opinion alongside Nurse Wolfe's treatment notes and the rest of the medical record. *See Cox v. Burnhart*, 345 F.3d 606, 609 (8th Cir. 2003) (finding that rejecting a conclusory opinion is incorrect when it is only one part of a treating provider's notes or medical record); *see also Brown v. Astrue*, 611 F.3d 941, 953 (8th Cir. 2010). The Court finds that the complete record related to Nurse Wolfe's treatment of Mr. F is relevant and consistent with her opinion and with the record as a whole. In sum, when viewed in the context of the entire medical record, it is clear that Nurse Wolfe's opinion "is a culmination" of Mr. F's entire treatment history with her rather than an isolated observation. *Cox*, 345 F.3d at 609.

Second, the ALJ's description of Nurse Wolfe's treatment notes as "just periodic treatment and medication adjustments" fails to accurately represent the record. Indeed, her notes provide a clear picture of Mr. F's continuing mental health symptoms. Nurse Wolfe first encountered Mr. F in 2013, and described him as agitated, easily angered and impulsive, with a limited and short attention span, a depressed mood, short-term memory problems, and intense speech. (R. 402.) Despite his ongoing treatment, compliance with medication, and occasional adjustments to try to improve the efficacy of his medications, Nurse Wolfe's notes reflect that Mr. F continued to experience severe symptoms. (R. 398 (May 15, 2014 appointment noting "[h]e can't focus long enough to read….Anxiety high."); R. 397 (July 31, 2014 appointment: "He can't focus long enough to read. Depression & anxiety are high. He is angry & misperceiving all the time….Sleep is poor, with nightmares."); R. 396 (Dec. 9, 2014 appointment: "More angry, misperceiving. Anhedonia. Sleep onet [sic] & maintenance are poor, without nightmares."); R. 395 (Dec. 22, 2014 appointment: "Mood remains anhedonic & irritable.").) Nurse Wolfe's notes continue in similar detail, for several years. (*E.g.,* R. 441, 447–61.) Indeed, one of the last of her treatment notes demonstrated severe symptoms of depression on PHQ-9 screening, ongoing issues with anger and anxiety, and "full-blown panic attacks when in public." (R. 459–61 (January 18, 2017 progress note).)

10

It is clear that Nurse Wolfe's treatment notes are far more than just periodic adjustments. Rather, they provide a record of Mr. F's lengthy, in-depth, and frequent treatment relationship with Nurse Wolfe. Ms. Wolfe's opinion deserved greater weight given her treating relationship with Mr. F, the length of that relationship and frequency of examinations, her specialization in providing mental health treatment, and the fact that she had acquired significant knowledge about his impairments over the course of their relationship. *See* 20 C.F.R. § 404.1527(c)(1)–(2); *id.* § 404.1527(f)(1) (requiring consideration of the factors in § 404.1527(c)(1)–(6) for opinions from medical sources that are not "acceptable medical sources").

Finally, substantial evidence does not support the ALJ's finding that Nurse Wolfe's conclusions are inconsistent with the overall record. Instead, the Court finds that her opinion is consistent with both her own treatment records and the record as a whole. For instance, her opinion is consistent with that of Mr. Schmitt, who saw Mr. F for a year, and Dr. Krueger, who worked in the same clinic as his two regular mental-health providers. The ALJ highlighted some short periods of improvement in Mr. F's functioning, but those periods do not constitute substantial evidence warranting a finding that Nurse Wolfe's notes are inconsistent with the record. Indeed, as the Eighth Circuit has recognized, "[i]t is possible for a person's health to improve, and for the person to remain too disabled to work." *Cox*, 345 F.3d at 609. As explored above, despite occasional suggestions of improvement, Mr. F's serious symptoms continued throughout the period of Nurse Wolfe's care, and indeed, throughout the period contemplated by the record before ALJ Phariss.

In sum, the Court finds that the ALJ erred when he gave little weight to Nurse Wolfe's opinion because he failed to read it in conjunction with the rest of her treatment notes. This error requires remand for further proceedings.[2]

---

[2] Mr. F highlights several other determinations made by the ALJ that he characterizes as error. However, because the Court determines that the case should be remanded on at least one of those bases, the Court need not reach the others.

11

## ORDER

For all the reasons stated above, **IT IS HEREBY ORDERED THAT:**

1. Plaintiff's motion for summary judgment **(ECF No. 11)** is **GRANTED**;
2. Defendant's motion for summary judgment **(ECF No. 19)** is **DENIED**; and
3. This matter is remanded to the Social Security Administration for further proceedings pursuant to sentence 4 of 42 U.S.C. § 405(g).

**Let Judgment be entered accordingly.**

Dated: September 27, 2019      *s/ Katherine Menendez*
Katherine Menendez
United States Magistrate Judge